## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **FAITH BENSON**, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　Plaintiff,<br>　v.<br><br>**SIMPLENURSING LLC**,<br><br>　　　　　　　　Defendant. | Case No. 1:24-cv-01118-GBW<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

### FIRST AMENDED CLASS ACTION COMPLAINT

Faith Benson ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to herself or her counsel, which are based on personal knowledge.

### NATURE OF THE CASE

1.　　Plaintiff brings this action to redress Defendant SimpleNursing LLC's ("Simple Nursing") practices of knowingly disclosing Plaintiff's and its other customers' identities and their purchases of subscriptions to access prerecorded video content to Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. ("Facebook") and TikTok Inc. ("TikTok"), in violation of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 et seq.

2.　　Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its customers' personally identifying video viewing information to Meta and TikTok using snippets of programming code called the "Meta Pixel" and the "TikTok Pixel," which Defendant chose to install and configure on its www.simplenursing.com website (the "Website").

3.      The information Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the subscription to prerecorded video material that each of its customers purchased on its Website alongside the URL where the subscription is available for purchase.  An FID is a unique sequence of numbers linked to a specific Meta profile.   A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person).  Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds.  Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person.  In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Meta information that reveals a particular person purchased a subscription to access prerecorded video content on Defendant's Website (hereinafter, "Private Viewing Information").

4.      The information Defendant disclosed (and continues to disclose) to TikTok via the TikTok Pixel includes the customer's cellular telephone number and the subscription to access prerecorded videos that each of its customers purchased on its Website alongside the URL where such prerecorded material is available for purchase.  A cellular telephone number or email is required *inter alia* to sign up for a TikTok account, which is set to receive a short code for verification purposes.  A TikTok profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person).  Entering the cellular telephone number on any search engine or a free reverse lookup site will return the owner's name.  Thus, the cellular telephone number or email used for sign-up identifies a person more precisely than a name, as numerous persons may share the same name, but a cellular

telephone number is usually uniquely associated with one and only one person.  In the simplest terms, the TikTok Pixel installed by Defendant captures and discloses to TikTok information that reveals a particular person purchased a subscription to access prerecorded video content on Defendant's Website (hereinafter, "Private Viewing Information").

5.    Defendant disclosed and continues to disclose its customers' Private Viewing Information to Meta and TikTok without asking for, let alone obtaining, their consent to these practices.

6.    The VPPA clearly prohibits what Defendant has done.  Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

7.    Accordingly, on behalf of herself and the putative Class members defined below, Plaintiff brings this Amended Class Action Complaint against Defendant for intentionally and unlawfully disclosing her and the Putative Class members' Private Viewing Information to Meta and TikTok.

## PARTIES

### I.    Plaintiff Faith Benson

8.    Plaintiff is, and at all times relevant hereto was, a citizen and resident of Orange County, Florida.

9.    Plaintiff is, and at all times relevant hereto was, a user of Meta and TikTok.

10.    Plaintiff is a consumer of the video products and services offered on Defendant's www.simplenursing.com Website.  She first subscribed to Defendant's Website on or about June 23, 2023 and maintained her subscription throughout the term of the plan selected.  Plaintiff

became a subscriber to Defendant's Website by registering for an account, paying for a subscription to access prerecorded video material, and providing her email address, payment information, and zip code.

11.    On multiple occasions during the two years preceding the filing of this action, Plaintiff used her subscription to Defendant's Website to request and obtain pre-recorded videos from Defendant.

12.    At all times relevant hereto, including when purchasing a subscription to Defendant's Website and accessing and obtaining the prerecorded video material provided to subscribers on Defendant's Website, Plaintiff had a Meta account, a Meta profile that displayed her picture and included her name, and an FID associated with such profile.

13.    At all times relevant hereto, including when purchasing a subscription to Defendant's website and accessing and obtaining the prerecorded video material provided to subscribers on Defendant's website, Plaintiff had a TikTok account, a TikTok profile that displayed her picture and included her name, and her cellular telephone number was associated with such profile.

14.    When purchasing her subscription to access prerecorded video material from Defendant's website, Defendant specifically required that Plaintiff provide her phone number, and as she provided her phone number, Defendant's programming of the TikTok Pixel automatically triggered the EnrichAM event code[1] for TikTok to collect Plaintiff's un-hashed phone number as

---

[1] EnrichAM is a Tiktok event code that is used for Enhanced Data Postback that collects more specific information about a user unless a user expressly and separately opts out of its auto collection. *See* TikTok, Enhance Data Postback with the TikTok Pixel, TikTok Bus. Help Ctr., https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel.  Plaintiff was not presented with an opportunity to opt-out, and as a result, she did not opt-out before her information was disclosed via the TikTok Pixel.

3

she typed it in and then TikTok transmitted Plaintiff's number in hashed value via the TikTok Pixel.

15.     After this information was transmitted, Plaintiff was later able to complete her order.

16.     At all times relevant hereto, when Plaintiff purchased a subscription to access prerecorded video content on Defendant's website, TikTok used Plaintiff's "contact details," as transmitted by Defendant's installation of the TikTok Pixel, to match her purchase and interactions on Defendant's website to her TikTok profile.

17.     Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Viewing Information to Meta or TikTok. In fact, Defendant has never even provided Plaintiff with written notice of its practices of disclosing its customers' Private Viewing Information to third parties such as Meta and TikTok.

18.     Because Defendant disclosed Plaintiff's Private Viewing Information (including her FID and her purchase of a subscription to Defendant's Website) to Meta during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

**II.     Defendant SimpleNursing LLC**

19.     Defendant is a domestic limited liability company with a principal place of business at 8 The Green, Ste A, Dover, Delaware 19901.  Defendant operates and maintains the Website www.simplenursing.com, where it sells subscriptions to access prerecorded video content on standardized examination preparation for exams such as the NCLEX-RN, TEAS, NCLEX-PN, and nursing school.

## JURISDICTION AND VENUE

20.    The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

21.    Personal jurisdiction and venue are proper because Defendant is a limited liability company formed under the laws of the State of Delaware and maintains its headquarters and principal place of business in Dover, Delaware, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

22.    The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta and TikTok) information that personally identifies consumers (like Plaintiff) as having requested or obtained particular videos, video services, or other audio-visual materials.

23.    Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]"  18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

24.    Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.*  Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and

rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

25.    Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes."  134 Cong. Rec. S5399 (May 10, 1988).   As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id*.

26.    While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,'

mobile apps and other new technologies have revolutionized the availability of Americans' information."[2]

27.    Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[3]

28.    In this case, however, Defendant deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Private Viewing Information to Meta and TikTok, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.    Consumers' Personal Information Has Real Market Value

29.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[4]

---

[2] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[3] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

[4] Transcript, The Information Marketplace (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

30.     Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[5]

31.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[6]

32.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[7]

33.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[8]

---

[5] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

[6] Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[7] *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

[8] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-

34.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[9]

35.    Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data
> brokers have developed hidden dossiers on every U.S. consumer.
> This large[-]scale aggregation of the personal information of
> hundreds of millions of American citizens raises a number of serious
> privacy concerns.[10]

36.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs.   Thus, when companies like SimpleNursing share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large

---

consumer-database-
marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20muc
h%2C%20much%20more.

[9] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

[10] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

37.    Disclosures like Defendant's are particularly dangerous to the elderly.    "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]

38.    The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

39.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.    Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

40.    Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice.    Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

---

[11] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

[12] *Id*.

[13] Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).
[14] *Id*.

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

41.    As the data aggregation industry has grown, so has consumer concerns regarding personal information.

42.    A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

43.    Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.   In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

44.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private

---

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[16] *Id.*

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

45.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

### III.    Defendant Uses Tracking Technologies to Systematically Disclose its Customers' Private Viewing Information to Third Parties

46.     As alleged below, when a consumer requests or obtains a specific subscription to access prerecorded video material from Defendant's Website, transmits the fact that a consumer purchased a subscription to prerecorded video materials or services, his or her FID or other personally-identifying information, and the URL where the subscription to access prerecorded video materials or services is available for purchase to Meta and TikTok, without the customer's consent and in clear violation of the VPPA.

---

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

[19] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

### A.  The Meta Pixel

47.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[20]  Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

48.    The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta.  This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

49.    Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[21]  This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[22] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.

---

[20] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

[21] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[22] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

50.    As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[23]

51.    Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[24]

52.    Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website's visitors to Meta.

53.    Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[25]

54.    Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[26]

55.    The Business Tools Terms define "Event Data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[27]

56.    Website operators use the Meta Pixel to send information about visitors to their Websites to Meta. Every transmission to Meta accomplished through the Meta Pixel includes at least

---

[23] Meta, "About Meta Pixel," available at
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[24] Meta, "Meta Business Tools Terms," available at
https://www.facebook.com/legal/technology_terms.
[25] *Id*.
[26] *Id*.
[27] *Id*.

two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission. Defendant had configured the Meta Pixel to transmit this information on its Website.

57.    When website operators make transmissions to Meta through the Meta Pixel, none of the following categories of information are hashed or encrypted: the visitor's FID, the website URL, or the Event Data.

58.    Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[28]

59.    Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

60.    Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed.  Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

61.    Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[29] including, as relevant here, the specific prerecorded video material or services that they purchase on the website.

---

[28] *See id.*
[29] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

**B. Defendant Knowingly Uses the Meta Pixel to Transmit the Private Viewing Information of its Customers to Meta**

62.    Defendant's paid subscriptions include exclusive access to prerecorded video content including a video library of on-demand videos and lectures.

63.    To purchase a subscription to the prerecorded video material on Defendant's Website, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

64.    When a consumer is completing the subscription process to gain access to the prerecorded videos on Defendant's Website, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the subscriber, the fact that the person is requesting or obtaining a subscription to access prerecorded video content from Defendant's Website (as well as the URL where such video material is available for purchase).

65.    Defendant intentionally programmed its Website (by following step-by-step instructions from Meta's website) to include a Meta Pixel that systematically transmits to Meta the FIDs of its subscribers and the fact that a subscription was purchased by each of them in order to take advantage of the targeted advertising and other informational and analytical services offered by Meta.

66.    With only a person's FID and knowledge that a person purchased a subscription to Defendant's Website (or URL where such a subscription is available for purchase)—all of which Defendant knowingly provides to Meta —any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video products or services that this person requested or obtained.    This can be accomplished simply by accessing the URL www.facebook.com/[unencrypted FID]/.

67.     Defendant's practices of disclosing that Plaintiff and members of the Class purchased subscriptions on Defendant's Website to Meta continued unabated for the full duration of the time period relevant to this action.   At all times relevant hereto, whenever Plaintiff or another subscriber of Defendant's Website requested or obtained a particular subscription (by clicking on it) on Defendant's Website, Defendant disclosed to Meta that (*inter alia*) the purchaser requested or obtained a subscription to video materials or services (including the URL where such material is available for purchase), along with the FID of the subscriber who requested it (which, as discussed above, uniquely identifies the person).

68.     At all relevant times, Defendant knew the Meta Pixel disclosed its subscribers' Private Viewing Information to Meta.

69.     Defendant could easily have programmed its Website so that none of its subscribers' detailed Private Viewing Information is disclosed to Meta. Instead, Defendant chose to program its Website so that all of its subscribers' detailed Private Viewing Information is sent to Meta *en masse*.

70.     Prior to transmitting its subscribers' Private Viewing Information to Meta, Defendant failed to notify Plaintiff or any of its other subscribers that it would do so, and neither Plaintiff nor any of its other subscribers have consented (in writing or otherwise) to these practices.

71.     By intentionally disclosing to Meta Plaintiff's and its other subscribers' FIDs together with information that they each purchased a subscription to prerecorded video material or services, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

### C. The TikTok Pixel

72.     In September 2016, ByteDance launched a short-form video content platform, which is now known as "TikTok". TikTok is now the leading destination for short-form mobile videos.[30] To create a TikTok account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

73.     The TikTok Pixel, first introduced in 2018 is a unique piece of code that can be placed on websites to share website events with TikTok, to measure traffic and ad campaign performance on the website, and to optimize ad campaigns for finding new customers. This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

74.     Websites, like Defendant's, can transmit through the TikTok Pixel the following information: device platform, webpage URLs viewed, session ID, anonymous user ID, browser information, event codes, currency, email addresses, and phone numbers.

75.     Additionally, the TikTok Pixel installed on a company's website allows the company to share its customers' Contact Details with TikTok – name, email address, and or phone number – or otherwise enable TikTok to collect Contact Details for matching purposes."[31]  This is because TikTok collects Contact Information during a person's sign-up – such as first and last name and phone number – which TikTok then assigns a unique and persistent identifier. The TikTok identifier does not prevent TikTok or anyone else from discovering a person's name by simply looking it up based on their phone number, however. The phone number is still connected to the TikTok account, and the transmissions made from a company's website to TikTok via the

---

[30] TikTok, About, https://www.tiktok.com/about?lang=en (last visited Oct. 22, 2024).
[31] TikTok Ads, Product Policy, TikTok, https://ads.tiktok.com/i18n/official/policy/product (last visited Oct. 22, 2024).

TikTok Pixel during the user's continuous session are accompanied by, *inter alia*, the phone number of the website's visitor.  Moreover, the TikTok Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

76.    TikTok has used the TikTok Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all its users' interactions with any of the hundreds of thousands of websites across the Internet on which the TikTok Pixel is installed.  TikTok then monetizes its database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

77.    Simply put, if a company chooses to install the TikTok Pixel on its website, both the company who installed it and TikTok (the recipient of the information it transmits) are then able to track the user's interactions with that particular webpage, including, as relevant here, the subscription to access prerecorded video material or the specific prerecorded video material that they purchase on any one of Defendant's website alongside their phone number.

**D. Defendant Knowingly Uses the TikTok Pixel to Transmit the Private Viewing Information of its Customers to TikTok**

78.    Similar to the Meta Pixel, during the purchase process on Defendant's Website, Defendant uses – and has used at all times relevant hereto – the TikTok Pixel to disclose to TikTok the device platform, webpage URLs viewed, session ID, anonymous user ID, browser information, event codes, currency, and phone number of the person who made the purchase and the fact that a person has purchased a subscription to access prerecorded video material (as well as the URL where such material is available for purchase).

79.    In order to take advantage of the targeted advertising and other informational and analytical services offered by TikTok, Defendant intentionally programmed its Website (by

following step-by-step instructions from TikTok's website) to include the TikTok Pixel code, which systematically transmits to TikTok personally identifiable information (a person's cell phone number and other unique device information) of each person with a TikTok account who purchases a subscription on Defendant's Website, along with the subscription that the person purchased.

80.    With only a person's cell phone number and the fact that a subscription was purchased (or URL where such material is available for purchase) from Defendant's Website—all of which Defendant knowingly and systematically provides to TikTok— TikTok is able to "match" an off-TikTok user with his or her TikTok account by that person's registered name, just like any ordinary person could learn the identity of the person to whom the cell phone number corresponds by simply, among other ways, doing a free online reverse lookup.  That said, an ordinary person receiving the information disclosed by Defendant will know a person's cellular phone number and the subscription that the person purchased (and thus requested and obtained), which directly identifies that person.

81.    Defendant's practice of disclosing the Private Viewing Information of its customers to TikTok continued unabated for the duration of the two-year period preceding the filing of this action.   At all times relevant hereto, whenever Plaintiff or any other person purchased a subscription to access prerecorded video material from Defendant's Website, Defendant disclosed to TikTok (*inter alia*) the subscription that was purchased (including the URL where such material is available for purchase), along with the cell phone number of the person who purchased it (which, as discussed above, uniquely identified the person).

82.    At all times relevant hereto, Defendant knew the TikTok Pixel was disclosing its customers' Private Viewing Information to TikTok.

83.     Although Defendant could easily have programmed its website so that none of its customers' Private Viewing Information is disclosed to TikTok, Defendant instead chose to program its Website so that all of its customers' Private Viewing Information is disclosed to TikTok.

84.     Before transmitting its customers' Private Viewing Information to TikTok, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

85.     By intentionally disclosing to TikTok Plaintiff's and its other customers' phone numbers together with the subscription purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff seeks to represent two classes defined as follows:

87.     **Meta Class**:         All persons in the United States who, during the two years preceding the filing of this action, purchased a subscription to access prerecorded video material or services from Defendant's www.simplenursing.com Website while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

88.     **TikTok Class**:         All persons in the United States who, during the two years preceding the filing of this action, purchased a subscription to access prerecorded video material or services from Defendant's www.simplenursing.com Website while maintaining an account with TikTok, Inc.

89.     Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Classes number in at least the tens of thousands.   The precise number of members in the Classes and their identities are unknown to

Plaintiff at this time but may be determined through discovery.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

90.    Common questions of law and fact exist for all members of the Classes and predominate over questions affecting only individual class members.  Common legal and factual questions include but are not limited to (a) whether Defendant embedded pixels on its Website that monitor and track actions taken by visitors to its Website; (b) whether Defendant reports the actions and information of visitors to third parties; (c) whether Defendant knowingly disclosed Plaintiff's and Class members' Private Viewing Information to third parties;  (d) whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether Plaintiff and members of the Classes are entitled to a statutory damage award of $2,500, as provided by the VPPA.

91.    The named Plaintiff's claims are typical of the claims of members in the Classes because Defendant's conduct toward the putative class is the same.  That is, Defendant embedded Meta Pixel and TikTok Pixel on its Website to monitor and track actions taken by consumers on its Website and report this to Meta.   Further, the named Plaintiff and members of the Classes suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to third parties.

92.    Plaintiff is an adequate representative of the Classes because she is interested in the litigation; her interests do not conflict with those of members within the Classes she seeks to represent; she has retained competent counsel experienced in prosecuting class actions; and she

intends to prosecute this action vigorously.    Plaintiff and her counsel will fairly and adequately protect the interests of all members of the Classes.

93.    The class mechanism is superior to other available means for the fair and efficient adjudication of the Classes' claims.    Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.    Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues.    Individualized litigation also presents a potential for inconsistent or contradictory judgments.    In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.    Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

94.    Plaintiff repeats the allegations asserted in the preceding paragraphs as if fully set forth herein.

95.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

96.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]"  Defendant is a

"video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials or services, similar to prerecorded video cassette tapes, to consumers nationwide.

97.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and members of the Classes are each a "consumer" within the meaning of the VPPA because they each registered for accounts and purchased a subscription to access prerecorded video material or services from Defendant's Website that was sold and delivered to them by Defendant.

98.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Private Viewing Information that Defendant transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Meta Class members to Meta as an individual who purchased, and thus "requested or obtained," a subscription to access prerecorded video content from Defendant's Website (including the URL where such material is available for purchase). The Private Viewing Information that Defendant transmitted to TikTok constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and TikTok Class members to TikTok by cellular telephone number as an individual who purchased, and thus "requested or obtained," a subscription to access prerecorded video content from Defendant's Website (including the URL where such material is available for purchase).

99.     Defendant knowingly disclosed Plaintiff's and members of the Classes' Private Viewing Information to Meta via the Meta Pixel technology because Defendant intentionally installed and programmed the Meta Pixel code on its Website, knowing that such code would

transmit the subscription purchased by its consumers (including the URL where such material is available for purchase) and the purchasers' unique identifiers (including FIDs).

100.    Defendant knowingly disclosed Plaintiff's and members of the Classes' Private Viewing Information to TikTok via the TikTok Pixel technology because Defendant intentionally installed and programmed the TikTok Pixel code on its Website, knowing that such code would transmit the subscription purchased by its consumers including the URL where such material is available for purchase) and the purchasers' unique identifiers (cellular telephone number, browser and device information).

101.    Defendant failed to obtain informed written consent from Plaintiff or members of the Classes authorizing it to disclose their Private Viewing Information to any third party.  More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased a subscription to access prerecorded video material or services on its Website (including Plaintiff or members of the Classes) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

102.    By disclosing Plaintiff's and members of the Classes' Private Viewing Information, Defendant violated their statutorily protected right to privacy in their Private Viewing Information.

103.    Consequently, Defendant is liable to Plaintiff and members of the Classes for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant SimpleNursing LLC as follows:

a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

b) For an order declaring that Defendant's conduct as described herein violated the VPPA;

c) For an order finding in favor of Plaintiff and the Classes and against Defendant on all counts asserted herein;

d) For an award of $2,500.00 to Plaintiff and each member of the Classes, as provided by 18 U.S.C. § 2710(c);

e) For an order permanently enjoining Defendant from disclosing the Private Viewing Information of its subscribers to third parties in violation of the VPPA;

f) For prejudgment interest on all amounts awarded;

g) For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiff and the Classes under Rule 23 and 18 U.S.C. § 2710(c); and

h) For any additional relief the Court finds appropriate.

Respectfully submitted,

Dated: January 17, 2025                              **COOCH AND TAYLOR, P.A.**

_/s/ R. Grant Dick IV_
R. Grant Dick IV (No. 5123)
Dean R. Roland (No. 6459)
The Brandywine Building
1000 North West St., Suite 1500
Wilmington, DE 19801
Telephone: (302) 984-3867
Facsimile: (302) 984-3939
gdick@coochtaylor.com
droland@coochtaylor.com

- and –

Elliot O. Jackson (admitted _pro hac vice_)
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone:      (305) 357-2107
Facsimile:      (305) 200-8801
ejackson@hedinllp.com

_Counsel for Plaintiff and Putative Class_

27